UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
JOSEPH MERMERLSTEIN,

                       Plaintiff,

          -against-


UNITED STATES DEPARTMENT OF
JUSTICE, FEDERAL BUREAU OF
INVESTIGATION,

                  Defendant.
---------------------------------------------------x

**REPORT AND**
**<u>RECOMMENDATION</u>**
19-CV-00312 (GRB)(JMW)

**WICKS,** Magistrate Judge:

Plaintiff Joseph Mermelstein commenced this action against Defendant United States Department of Justice, Bureau of Investigation, alleging that Defendant was wrongfully withholding documents that Plaintiff properly requested pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.* Before the Court on referral from the Honorable Gary R. Brown is Defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, and Plaintiff's cross-motion for an *in camera* review of every document withheld by Defendant. For the reasons that follow, the undersigned respectfully recommends that Defendant's motion for summary judgment be granted in part, Plaintiff's cross-motion for *in camera* review be denied, and that Defendant be given fourteen (14) days to file certain documents pertaining to a court sealing order to support its motion.

## FACTUAL BACKGROUND

The following facts are drawn from the parties' Statements pursuant to Local Rule 56.1 (DE 20, 24), as well as other evidence supplied in the record.[1] *See Ayazi v. United Fed'n of Tchrs. Local 2,̧ 487 F.

App'x 680, 681 (2d Cir. 2012) ("[W]hen assessing a summary judgment motion, a District Court may consider other materials in the record") (internal quotation marks and citation omitted).

Defendant investigated Plaintiff, an ophthalmologist in Staten Island, New York, for his suspected medical insurance fraud. (DE 20 ¶ 1.) On November 20, 2007, Plaintiff pled guilty to one count of conspiracy to defraud the United States government. (*Id.* ¶ 2.) Following the guilty plea, the district court sentenced Plaintiff to five years imprisonment with three years of supervised release. (*Id.* ¶ 3.) That sentence was upheld on appeal to the Second Circuit. (*Id.* ¶ 4; *see also United States v. Crone*, 343 F. App'x 688, 690–91 (2d Cir. 2009).)

On January 29, 2018, Plaintiff submitted, through his attorney, a FOIA request to Defendant seeking:

> [A]ny surveillance made or obtained by the FBI through or with the assistance of American Telephone and Telegraph performing electronic surveillance on Joseph Mermelstein, 24 Joy Drive, New Hyde Park, New York 11040 or 2177 Victory Blvd., Staten Island, New

---

[1] "Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York . . . requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003). The "party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. The facts set forth in a moving party's statement will be deemed to be admitted unless controverted by the opposing party's statement." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72 (2d Cir. 2001) (internal quotation marks and citations omitted); *see Taylor & Fulton Packing, LLC v. Marco Int'l Foods,*

*LLC,* No. 09-cv-2614, 2011 WL 6329194, at *4 (E.D.N.Y. Dec. 16, 2011) ("Where a nonmovant fails to file a [Rule 56.1 Statement], courts frequently deem all supported assertions in the movant's statement admitted and find summary judgment appropriate."). Plaintiff has failed to file an opposing Rule 56.1 Statement and has instead opted to only file his own Rule 56.1 Statement. As such, the facts set forth in Defendant's 56.1 Statement that are supported by admissible record evidence are accepted as true. *See Oka v. Cnty. of Suffolk*, No. 11-CV-2578 (SJF), 2015 WL 918762, at *2 n.2 (E.D.N.Y. Mar. 2, 2015). The Court notes that, to the extent Plaintiff's Rule 56.1 Statement attempts to assert material, undisputed facts, Plaintiff fashions these "facts" merely as arguments regurgitated from his opposition papers.

York. Reference telephone numbers (516) 365-7178 and (714) 494-9055. We are requesting all records, whereby his telephone calls both oral and electric were intercepted, disclosed and intentionally taken by the FBI, its agents, servants, and/or employees and/or AT&T, its agents, servants, and or employees. We are requesting copies of all such telephone calls and electronic communications intercepted for disclosure intentionally used and given to third parties by the AT&T and the FBI, their agents, servants, and/or employees, during this time period together with copies of same.

(DE 20 ¶ 5.) Roughly two weeks later, Defendant received a second, related FOIA request, which sought:

[A]ll records about Joseph Mermelstein . . . which are retrievable through the use of any combination of identifiers. The information requested are copies of all information, records, documentation or any other type of information in your possession including electronic surveillance of Mr. Mermelstein on telephone number (516) 365-7178 and (714 (494-9055 at 24 Joy Drive, New Hyde Park, New York 11040 and 2177 Victory Blvd., Staten Island, New York, between the years January 1, 2003 and

December 31, 2005, including any information obtained to his telephone, cellphone calls oral and electric communications, by the FBI, its agents, servants, and/or employees and/or American Telephone and Telegraph, its agents, servants, and/or employees at the request of the FBI or in conjunction with the FBI and/or others.

(*Id.* ¶ 6.)

Defendant conducted a search for records responsive to Plaintiff's requests, ultimately locating 2,159 pages potentially responsive to Plaintiff's request. (*Id.* ¶ 7.) Defendant searched the Central Records System ("CRS"), where the FBI indexes information about individuals, organizations, and other subjects of investigative interest for future retrieval. (DE 22 ¶¶ 27, 43–44.) To locate records within the CRS, Defendant utilized several automated case management systems—specifically the Automated Case Support/Universal Index ("ACS/UNI") and Sentinel systems—as well as manual indices—consisting of 3" x 5" paper index cards containing information for older subjects—to search for main and reference records responsive to Plaintiff's request. (*Id.* ¶¶ 35, 42–45.) Defendant did not, however, search the Electronic Surveillance Indices ("ELSUR") which, although being a separate system, largely would have produced records duplicative of those found in the ACS/UNI and Sentinel systems. (*Id.* ¶ 45.)

Following its records search, Defendant informed Plaintiff about the timing and costs associated with the production process. (DE 20 ¶ 8.) On January 16, 2019, prior to any production of documents, Plaintiff initiated this action

3

seeking to compel Defendant to produce the requested records. (*Id.* ¶ 9; *see* DE 1.) Pursuant to a court-approved jointly proposed schedule (DE 10, 11), Defendant made five document releases to Plaintiff between July 1 and November 1, 2019 on a rolling basis (DE 20 ¶ 10). During that period, Defendant reviewed the 2,159 potentially responsive documents from Plaintiff's file. (*Id.*) Following review, Defendant released 718 pages in full, 973 pages in part, and withheld the remaining 468 pages in full. Information was withheld because, according to Defendant, "pages/portions . . . were exempt pursuant to one or more applicable FOIA exemptions; the pages were found to be duplicative of other pages accounted for elsewhere in the production; and/or the pages are sealed pursuant to court order, and are unavailable for release through FOIA." (*Id.*) Regarding the FOIA exemptions, Defendant relied on FOIA Exemptions 3, 5, 6, 7(A), 7(D), and 7(E) in withholding documents in full or in part. (*See, e.g.*, DE 22.) In addition to producing non-exempt documents, Defendant also provided Plaintiff a *Vaughn* index detailing the asserted FOIA exemptions on a per document basis. (*See* DE 20 ¶ 11; DE 22-14.) Plaintiff now challenges the validity of each exemption relied upon by Defendant in withholding the records that are otherwise responsive to Plaintiff's request.

## PROCEDURAL HISTORY

Plaintiff commenced this FOIA action on January 16, 2019. (DE 1.) On January 9, 2020, the Court adopted the parties' proposed limited discovery schedule in part, setting a deadline for Defendant to produce its *Vaughn* index and directing the parties to meet and confer to address outstanding issues following Plaintiff's review of the index. (DE 11.) After the meet and confer, Plaintiff indicated his intent to challenge each of Defendant's withholdings. (DE 15.)

Defendant now moves for summary judgment, seeking to dismiss Plaintiff's complaint. (DE 19.) Plaintiff opposes that motion, and cross-moves for *in camera* review of each withheld document. (DE 25.) The district court referred these motions to the Honorable Magistrate Judge Steven Locke for a Report and Recommendation. (Electronic Order dated Mar. 19, 2019.) This case—along with the Report and Recommendation referral—was then reassigned to the undersigned. (Electronic Order dated May 13, 2021.)

## DISCUSSION

### General Summary Judgment Standard

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to draw all justifiable inferences in the nonmovant's favor,

*Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact, *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## Summary Judgment and FOIA

Under the FOIA, United States government agencies must generally disclose agency records upon receiving a properly submitted written request for them. 5 U.S.C. § 552(a)(3)(A). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted). In that regard, "FOIA provides an avenue for government transparency by making documents available to the public." *N.Y. Times v. Cent. Intel. Agency*, 965 F.3d 109, 114 (2d Cir. 2020).

However, not every government record must be released in response to a request. Rather, the statute enumerates nine categories of records that are *exempt* from the disclosure requirements, 5 U.S.C. § 552(b), and three categories of records that are *excluded* from the FOIA altogether, 5 U.S.C. § 552(c). "These exemptions [and exclusions] are the primary means by which an agency may avoid production of records subject to FOIA; 'unless the requested material falls within one of these . . . statutory exemptions [or exclusions], FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public.'" *Cox v. Dep't of Just.*, 504 F. Supp. 3d 119, 127 (E.D.N.Y. 2020) (quoting *N.L.R.B. v. Robbins Tire & Co.*, 437 U.S. 214, 221 (1978)). Exemptions and exclusions to FOIA "are explicitly made

exclusive," and courts must narrowly construe them. *Milner v. Dep't of Navy*, 562 U.S 562, 565 (2011) (internal quotation marks and citations omitted). One who believes an agency has wrongfully withheld documents subject to FOIA's disclosure mandate "may seek an order of production from a district court, which will review the matter *de novo*, placing the burden on the agency to defend its non-disclosure decisions." *Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 544 (2d Cir. 2016) (citing 5 U.S.C. § 552(a)(4)(B)). When push comes to shove, "[j]udicial authority to devise remedies and enjoin agencies can only be invoked, under the jurisdictional grant conferred by" FOIA, if the agency has improperly withheld agency records. *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980).

Courts routinely resolve challenges to FOIA withholdings at the summary judgment stage. *See, e.g.*, *Platsky v. Food & Drug Admin., Div. of Freedom of Info.*, No. 13–CV–06250 (SLT)(RLM), 2014 WL 7391611, at *3 (E.D.N.Y. Dec. 24, 2014) ("FOIA cases are generally and most appropriately resolved on motions for summary judgment.") (internal quotation marks and citation omitted); *Am. C.L Union v. Dep't of Def.*, 435 F. Supp. 3d 539, 553 (S.D.N.Y. 2020) ("Summary judgment is the usual means by which a court resolves a challenge to a government agency's FOIA response.") (citation omitted). To achieve summary judgment in a FOIA action, a defendant agency must show that: (1) it conducted an adequate search for responsive records; and (2) any withheld documents fall under a FOIA exemption or exclusion. *Carney v. United States Dep't of Just.*, 19 F.3d 807, 812 (2d Cir. 1994); *see Minkovski v. United States Dep't of Treasury*, 384 F. Supp. 3d 244, 250 (E.D.N.Y. 2019).

Affidavits or declarations are ordinarily the principal source of proof in FOIA cases on summary judgment motions. *Minkovski*, 383 F. Supp. 3d at 250 (citing *Florez v. Cent. Intel. Agency*, 829 F.3d 178, 182 (2d Cir. 2016)). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009); *see also Carney*, 19 F.3d at 812 ("Affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reason explanations why any withheld documents fall within an exemption are sufficient to sustain the agency's burden."). Agency affidavits "are accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Intellectual Prop. Watch v. United States Trade Representative*, 344 F. Supp. 3d 560, 567 (S.D.N.Y. 2018) (internal quotation marks and citation omitted); *see Wilner*, 592 F.3d at 69 ("The '[a]ffidavits submitted by an agency are accorded a presumption of good faith.'") (quoting *Carney*, 19 F.3d at 812).

After the defendant agency has satisfied its burden, the plaintiff "must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations . . . or provide some tangible evidence that an exemption claimed by the agency should not apply" in order to survive summary judgment. *Carney*, 19 F.3d at 812 (citations omitted); *see Anderson v. United States Dep't of Just.*, 326 F. App'x 591, 592–93 (2d Cir. 2009) (summary order); *Cox*, 504 F. Supp. 3d at 151.

**Adequate Search**

Defendant has demonstrated that it conducted an adequate search for Plaintiff's requested documents. Defendant submitted in support of its motion for summary judgment the Declaration of Michael G. Seidel, FBI Section Chief of the Record/Information Dissemination Section in the Information Management Division located in Winchester, Virginia. (DE 22 ¶ 1.) The Seidel Declaration painstakingly describes the CRS—the "extensive system of records . . . compiled and maintained by the FBI"—including how CRS files are opened, how they are demarcated, and how the CRS is indexed, as main entries and reference entries, for document retrieval purposes. (*Id.* ¶¶ 25–28.) Further, the Declaration explains the evolution of the FBI's case management system over the years, detailing the transition from manual indices to the ACS/UNI and ACS/UNI to Sentinel. More importantly, Mr. Seidel elucidates the FBI's practice on retrieving documents—first by conducting an index search via ACS/UNI, then by running an index search of Sentinel, and finally—for good measure—reviewing the FOIA request to ensure all the proper scoping and indexing decisions were made in response to the request, supplementing the search by reviewing manual indices for requests implicating older records. (*Id.* ¶¶ 35–38.)

After thoroughly explaining the FBI's record system and retrieval procedure, Mr. Seidel describes the search conducted in response to Plaintiff's document request. Defendant searched both main files and reference materials that were potentially responsive to Plaintiff's request. (*Id.* ¶ 42.) Running index searches, Defendant searched the CRS—the record system where the FBI indexes information about individuals, organizations, and other subjects of investigative interest for future retrieval—

employing *both* the ACS/UNI and Sentinel automated systems, as well as the manual indices, given the age of Plaintiff, located in three different offices. (*Id.* ¶¶43–45.) Defendant searched Plaintiff's name, "Joseph Mermelstein," as well as two aliases, "Joseph Ross Mermelstein" and "Joseph R. Mermelstein," yielding a main responsive main file and responsive reference file to Plaintiff's request. (*Id.*¶ 44.) As a result of the search, Defendant processed a total of 2,159 pages of records responsive to Plaintiff's request, releasing 718 pages in full, 973 pages in part, and withholding the remaining 468 pages. (*Id.* ¶ 4.) Mr. Seidel's Declaration satisfies the requirement that the FBI conduct a reasonable search for Plaintiff's documents. *See Carney* 19 F.3d at 812; *see also Garcia v. United States Dep't of Just., Off. of Info. & Priv.*, 181 F. Supp. 2d 356, 366–67 (S.D.N.Y. 2002) (finding FBI's search methods were "reasonably calculated" to produce documents responsive to plaintiff's request where the submitted declaration described the CRS in detail, described the subject matter of the file searched, and set forth the number of documents found, processed, and released to plaintiff). Further, the Declaration is accorded a presumption of good faith, and Plaintiff must offer evidence of bad faith on the part of Defendant—beyond "purely speculative claims about the existence and discoverability of other documents," *Intellectual Property Watch,* 344 F. Supp. 3d at 567—to defeat Defendant's motion for summary judgment on the basis of the adequacy of the search, *Carney* 19 F.3d at 812.

Plaintiff's argument regarding the adequacy of Defendant's search centers on the assertion that "Defendant[] admit[s] that [it] did not search the other FBI system, ELSUR, which is more complete than the system [it] searched and will contain Plaintiff's entire file including documents that weren't destroyed in the file they searched." (DE 25 at 5.) Plaintiff adds that—to conduct an "adequate" search—Defendant should be required to search the ELSUR indices at the FBI Headquarters, the FBI Field Office in New York, and the FBI Field Office in Los Angeles. (*Id.* at 5–6.) While Defendant admittedly did not search the ELSUR indices in response to Plaintiff's request, the Seidel Declaration makes clear that "any responsive records/information within ELSUR indices would be duplicative of information available within ACS/UNO and Sentinel indices"—the indices Defendant searched—"thus, a search of ACS/UNI and the Sentinel indices also accomplished the task of locating any responsive records in ELSUR indices via the same index search terms." (DE 22 ¶ 45.) As such, Defendant's search efforts in this case square with the principles that "[a] search need not be perfect, only adequate, . . . adequacy is measured by the reasonableness of the effort in light if the specific request," and "a search is adequate if it is reasonably calculated to discover the requested documents." *Katzman v. C.I.A.*, 903 F. Supp. 434, 437 (E.D.N.Y. 1995) (internal quotations and citations omitted).

Moreover, Plaintiff's argument—that an adequate search must necessarily include an ELSUR search—was specifically rejected by the Hon. Lois Bloom in *Clevenger v. United States Dep't of Just.*, 18 CV 1568 (LB), 2020 WL 1846565 (E.D.N.Y. Apr. 3, 2020). There, the FBI—in response to plaintiff's FOIA request—conducted a search of the CRS by employing both the ACS/UNI and Sentinel automated systems. *Id.* at *8. Plaintiff argued that the search was inadequate because the FBI did not conduct an additional ELSUR search. *Id.* The *Clevenger* court disagreed, reasoning that "the FBI need not probe every data base that may have responsive records, rather the FBI

must show that its search efforts were reasonable and logically organized to uncover relevant documents; it need not knock down every search design advanced by every requestor." *Id.* at 9 (internal quotation marks and citations omitted). Thus, Plaintiff's argument here that Defendant's search was inadequate because an ELSUR search was not employed—identical to the argument rejected in *Clevenger*—must likewise fail.

To overcome the presumption of good faith afforded to Defendant's submitted Declaration, Plaintiff asserts that Defendant acted in bad faith because Mr. Seidel "never said he read a single page" of any withheld document. (DE 25 at 18–20.) The Second Circuit has made clear, however, that "there is no need for the agency to supply affidavits from each individual who participated in the actual search" for requested documents; rather, "[a]n affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e)." *Carney*, 19 F.3d at 814 (citation omitted); *see Minkovski*, 384 F. Supp. at 250 n.2. Mr. Seidel "supervise[s] approximately 237 FBI employees . . . whose collective mission is to effectively plan, develop, direct, and manage responses to [FBI FOIA requests]." (DE 22 ¶ 2.) Mr. Seidel is further "aware of the FBI's handling of Plaintiff's [FOIA] request for the records related to Joseph Mermelstein." (*Id.* ¶ 3.) Accordingly, and contrary to Plaintiff's contention, the fact that Mr. Seidel did not read each withheld document, and only supervised the response effort, does not undermine the presumption of good faith afforded to Defendant.

In sum, Defendant's search for documents in response to Plaintiff's request was adequate, and Plaintiff has failed to overcome the presumption of good faith afforded to Defendant here.

## FOIA Exemptions

In withholding responsive records from Plaintiff, the FBI relied on FOIA Exemptions 3, 5, 6, 7(A), 7(D), and 7(E). The Court will discuss each in turn.

### *FOIA Exemption 3*

FOIA Exemption 3 exempts from disclosure information which is:

> specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria from withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph.

5 U.S.C. § 552(b)(3). When an agency relies on Exemption 3 as a basis for withholding, courts "must consider whether the statute identified by the agency is a statute of exemption as contemplated by Exemption 3 . . . [and] whether the withheld material satisfies the criteria of the exemption statute." *Wilner*, 592 F.3d at 72 (internal quotation marks and citation omitted). Here, the statute relied upon by Defendant here is Federal Rule of Criminal Procedure 6(e), which mandates that Grand Jury material be kept secret in most instances.[2] *See, e.g.*, Fed. R.

---

[2] Federal Rule of Criminal Procedure 6(e) was enacted before 2009 and therefore is not required to

specifically cite to 5 U.S.C. § 552(b)(3) for exempted status under FOIA. *See Sorin v. United States Dep't*

Crim. P. 6(e). In light of its sweeping secrecy mandate, courts have held that Exemption 3 does indeed cover Rule 6(e). *See Garcia*, 181 F. Supp. 2d at 378–79 (holding that "documents related to the grand jury process are exempt from disclosure under Exemption 3") (citing *Local 32B–32J, Serv. Emps. Int'l Union, AFL–CIO v. GSA*, No. 97 Civ. 8509(LMM), 1998 WL 726000, at *6 (S.D.N.Y. October 15, 1998) ("It is well established that [Fed.R.Crim.P. 6(e)], which imposes a general requirement of secrecy for information relating to the grand jury process, qualifies as an Exemption 3 withholding statute.")).

Defendant withheld a number of documents pursuant to Exemption 3. These documents were withheld because they "contain[ed] information about the names of recipients of federal grand jury subpoenas; information that identifies specific records subpoenaed by a federal grand jury; and copies of specific records proved to a federal grand jury in response to federal grand jury subpoenas." (DE 22 ¶ 54.) This information is exactly the type that Rule 6(e) is intended to protect and, as such, was properly excluded from disclosure under Exemption 3.

Accordingly, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant for documents withheld pursuant to Exemption 3.

### *FOIA Exemption 5*

FOIA Exemption 5 exempts from disclosure matters that are "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5); *see Am. C.L. Union v. Nat'l Sec. Agency*, 925 F.3d 576, 589 (2d Cir. 2019). Exemption 5 incorporates into FOIA each generally recognized civil discovery privilege, including the work product privilege, attorney-client privilege, and deliberative process privilege. *See Am. C.L. Union v. United States Dep't of Just.*, 210 F. Supp. 3d 467, 476 (S.D.N.Y. 2016) (quoting *Nat'l Council of La Raza v. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005)). Defendants relied on each of these privileges in asserting Exemption 5 to withhold various documents.

Work Product Privilege

The work product privilege is codified in Federal Rule of Civil Procedure 26(b)(3), which prohibits a party in litigation from discovering any "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative," absent a showing of substantial need.[3] Fed. R. Civ. P. 26(b)(3)(A). Documents covered by the privilege include materials that reveal an attorney's mental impressions and opinions about a case, as well as the results of an attorney's factual investigation in anticipation of litigation. Fed. R. Civ. P. 26(b)(3)(B). Notably, "[t]he work product of government attorneys is entitled to the same protection as that of private lawyers." *Clevenger*, 2020 WL 1846565, at *16 (citing *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 154 (1975)).

---

*of Just.*, 280 F. Supp. 3d 550, 558 n.3 (S.D.N.Y. 2017) ("Because Rule 6(e) was enacted before 2009, [the Open FOIA Act] aspect of Exemption 3 does not apply.").

[3] Notably, the Supreme Court has held that Exemption 5 does *not* permit disclosure of work product based on a requestor's showing of substantial need, unlike the applicable standard under the Federal Rules of Civil Procedure. *See Fed. Trade Comm. v. Grolier*, 462 U.S. 19, 27–28 (2000).

Defendant here withheld documents "regarding a review of medical procedure codes, diagnostic codes, and Medicare payments to [Plaintiff]." (DE 22 ¶ 58.) This information passed between FBI personnel and the United States Attorney's Office, and was created at the direction of an attorney preparing a criminal case against Plaintiff. And, as noted in the *Vaughn* index, these documents also include memoranda "list[ing] complaints" against Plaintiff. (DE 22-14 at 9.) Whether these documents contain factual work product or opinion work product—which enjoys a heightened level of protection from disclosure, *see United States v. Adlman*, 134 F.3d 1194, 1197 (2d Cir. 1998)—this information is properly withheld pursuant to Exemption 5, *see Clevenger*, 2020 WL 1846565 at *16 (granting summary judgment to defendants in FOIA action based on declaration evidencing that documents constituted attorney work product). Thus, Defendant's withholding of this information based on Exemption 5 was proper.

Additionally, the Executive Office for the United States Attorneys ("EOUSA") requested protection of certain information, specifically the document bearing Bates number 2, pursuant to Exemption 5 as attorney work product. The Declaration of Tricia Francis, attorney advisor to the EOUSA, states that this document is a letter from an Assistant United States Attorney ("AUSA") to an FBI agent, and is therefore an intra-agency communication. (DE 22-15 ¶ 9.) Moreover, the letter discusses steps taken in a sealed case regarding the on-going investigation of the named defendant and invites the FBI agent to confer with the AUSA regarding potential next steps in the case. (*Id.* ¶¶ 10–11.) This document was clearly made in anticipation of litigation, and therefore constitutes attorney work product. As such, Defendant—at the request of the

EOUSA—appropriately withheld it under Exemption 5.

Attorney-Client Privilege

The attorney-client privilege protects communications: (1) between a client and his or her attorney; (2) that are intended to be—and in fact were—kept confidential; (3) for the purpose of obtaining or providing legal assistance. *Brennan Ctr. for Just. at N.Y. Univ. Sch. of Law v. United States Dep't of Just.*, 697 F.3d 184, 207 (2d Cir. 2012) (citation omitted). This well-known privilege "protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance." *In re Cnty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007). "[T]he traditional rationale for the privilege applies with special force in the government context," *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005), as government officials require "candid legal advice" to "understand and respect constitutional, judicial and statutory limitations," *In re Cnty. of Erie*, 473 F.3d at 419. In such circumstances, the "client" is often the agency, and the attorney is typically the agency's lawyer. *Tax Analysts v. I.R.S.*, 117 F.3d 607, 618 (D.C. Cir. 1997).

Defendants here "withheld documents that are communications between Assistant United States Attorneys . . . and Special Agents . . . discussing legal matters related to the investigation and prosecution" of Plaintiff. (DE 22 ¶ 60.) According to the Seidel Declaration, the attorney-client privilege applies to these documents because: (1) they were made between FBI and DOJ counsel and their clients, FBI employees; (2) were made in confidence and were not shared with others outside of the attorney-client relationship; and (3) were made for the

purpose of securing legal advice regarding their legal position in Plaintiff's criminal proceedings. (*Id.*) Indeed, the *Vaughn* index corroborates this assertion—documents withheld in reliance of the attorney-client privilege include: "list[s] of complaints against [Plaintiff]" (DE 22-14 at 9); "trial preparation" documents (*id.* at 19); and update[s] [to the] case file" (*id.* at 19). These documents are precisely the type that are ordinarily protected by the attorney-client privilege. As such, Defendant properly withheld these documents pursuant to Exemption 5.

Additionally, Defendant withheld one document, bearing Bates number 850, at the request of the Department of Health and Human Services ("DHHS"). (DE 22 ¶ 107.) The Declaration of Robin Brooks, the Director of the Freedom if Information Act Division of the DHHS, avers that the DHHS recommended that Defendant withhold this document in part pursuant to Exemption 5 and the attorney-client privilege.[4] (DE 22-16 ¶¶ 10, 13.) The Brooks Declaration states that the withheld information included communications between a DHHS attorney and the DOJ that were intended to be kept, and indeed were kept, confidential, and "were made for the purpose of receiving or providing legal advice about how the case fits into the statutory scheme, and the options that DOJ could take in pursuing the case under the law." (DE 22-16 ¶ 13.) Because the withheld information satisfies the requirements for attorney-client privilege, Defendant properly withheld this document pursuant to Exemption 5 as well.

Deliberative Process Privilege

The deliberative process privilege protects documents that are: "(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker at arriving at his decision[;] and (2) deliberative, *i.e.*, actually related to the process by which policies are formulated." *La Raza*, 411 F.3d at 356 (internal quotation marks omitted) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)). This privilege captures "the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quoting *Sears, Roebuck, & Co.*, 421 U.S. at 151); *accord Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("The [deliberative process] privilege has a number of purposes: it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action."). This privilege covers a number of materials, including "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy

---

[4] The DHHS also recommended that Defendant withhold the document pursuant to Exemption 5 and the deliberative process privilege. (DE 22-16 ¶ 14.)

of the agency," as well as "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Grand Cent. P'ship, Inc.*, 166 F.3d at 482 (citation omitted).

Defendant agencies asserting the deliberative process privilege to support an Exemption 5 withholding must—in addition to establishing a basis for the privilege—demonstrate why disclosure of the documents would harm the agency. "An agency may not 'perfunctorily state that disclosure of all the withheld information—regardless of category or substance—would jeopardize the free exchange of information' among or between government officials." *Nat'l Res. Def. Council v. United States Env't Prot. Agency*, No. 17 Civ. 5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (internal citations omitted) (quoting *Rosenberg v. United States Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018)); *see Jud. Watch v. United States Dep't of Com.*, 375 F. Supp. 3d 93, 101 (D.D.C. 2019) (holding that agency's proffered Exemption 5 withholding explanation that disclosure "could chill [agency] speech" was insufficient because "[t]he question is not whether disclosure could chill speech, but rather if it is reasonably foreseeable that it will chill speech and, if so, what is the link between this harm and the specific information contained in the material withheld").

Defendant relied on Exemption 5 and the deliberative process privilege in withholding deliberative email communications and information located within investigative records. (DE ¶¶ 63–64.) The Seidel Declaration states that these emails contain deliberations where agents are "requesting/providing feedback, making proposals, and/or working to come to a consensus on final agency decisions." (*Id.* ¶

63.) Such documents include communications between two AUSAs and between an AUSA and FBI SA, and include discussions regarding what actions should be taken to further investigation efforts. (*Id.*) Further, the investigative records include communications where "FBI staff are providing advice, asking questions within the agency, proposing actions, and/or deliberating to determine a final decision and/or course of action related to" Plaintiff's investigation. (*Id.* ¶ 64.) The Seidel Declaration states that public disclosure of this information would chill agency speech, and adds that public disclosure could also "create public confusion" because the material predates final agency decisions. (*Id.* ¶¶ 63–64.) Such emails and investigative records are both predecisional and deliberative. They are predecisional in that they contemplate taking further investigative efforts, and they are deliberative in that they relate to coming to an ultimate determination on how to proceed in investigations. Documents revealing such "give-and-take" between agency members are properly protected by deliberative process. *Color of Change v. United States Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 454 (S.D.N.Y. 2018). Moreover, the threat of public of confusion that would follow public disclosure is these communications is sufficient to warrant Exemption 5 protection. *Id.* (citing *Robert v. Dep't of Health & Hum. Servs.*, No. 01-CV-4778 (DLI), 2005 WL 1861755, at *4 (E.D.N.Y. Aug. 1, 2005). Thus, the email communications and information located in investigatory records were properly withheld under Exemption 5 through the deliberative process privilege.

In sum, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant for documents withheld pursuant to Exemption 5.

***FOIA Exemptions 6 & 7(C)***

Defendant relies on Exemptions 6 and 7(C) for withholding certain documents. Because "both exemptions balance individuals' privacy interests in protecting information from disclosure against the public interest in disclosure," the Court will analyze them together. *Conti v. United States Dep't of Homeland Sec.*, No. 12 Civ. 5827(AT), 2014 WL 1274517, at *17 (S.D.N.Y. Mar. 24, 2014).

FOIA Exemption 6 exempts from disclosure information in agency personnel, medical, or other similar files, the disclosure of which "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The primary purpose behind Exemption 6 is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *United States Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982). The Second Circuit has adopted a two-part inquiry for analyzing Exemption 6 withholdings. First, courts must determine whether the withheld files are personnel, medical, or "similar" files. *Cook v. Nat'l Archives & Recs. Admin.*, 758 F.3d 168, 174 (2d Cir. 2014) (citing *Associated Press v. United States Dep't of Def.*, 554 F.3d 274, 291 (2d Cir. 2009); *Wood v. F.B.I.*, 432 F.3d 78, 85 (2d Cir.2005)). "[A] record is a 'similar file' if it contains personal information identifiable to a particular person. *Id.* at 175 (citations omitted). Second, if the withheld material comprises personnel, medical, or similar files, courts must "'balance the public need for the information against the individual's privacy interest in order to assess whether disclosure would constitute a clearly unwarranted invasion of personal privacy.'" *Id.* at 174 (quoting *Associated Press*, 554 F.3d at 291).

On one hand, "[t]he privacy side of the balancing test is broad and encompasses all interest involving the individual's control of information concerning his or her person." *Wood¸* 432 F.3d at 88 (internal quotation marks and citations omitted); *see O'Keefe v. United States Dep't of Def.*, 463 F. Supp. 2d 317, 326 (E.D.N.Y. 2006) ("[I]nvestigative personnel have significant privacy interests as they may be subject to harassment or embarrassment if their identities are disclosed.") (citation omitted). On the other hand, the public interest inquiry asks whether disclosure would "she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Wood*, 432 F.3d at 88 (citation omitted). Accordingly, "[g]oals other than opening agency action to public scrutiny are deemed unfit to be accommodated under the FOIA when they clash with privacy rights." *Fed. Lab. Rels. Auth. v. United States Dep't of Veterans Affs.*, 958 F.2d 503, 510–11 (2d Cir. 1992).

Similarly, Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Identifying information—such as names, addresses, or other personal information— "fall[] within the ambit of privacy concerns under FOIA." *Associated Press*, 554 F.3d at 285; *see Massey v. Fed. Bureau of Investigation*, 3 F.3d 620, 624 (2d Cir. 1993) (holding that "individuals, including government employees and officials, have privacy interests in the dissemination of their names"). Privacy interests of government employees generally require protection, as the "revelation of their identities could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs." *Halpern v.*

*F.B.I.¸* 181 F.3d 279, 297 (2d Cir. 1999) (internal quotation marks and citation omitted). Moreover, "[t]hird parties . . . have perhaps even stronger privacy interests insofar as the material in question demonstrates or suggests they had at one time been subject to criminal investigation." *Id.* (citation omitted).

Like Exemption 6, Exemption 7(C) requires the same balancing of private interests against public interests in document disclosure. *Fams. for Freedom v. United States Customs & Border Prot.*, 797 F. Supp. 2d 375, 389 (S.D.N.Y. 2011) (citing *McCutchen v. United States Dep't of Health and Hum. Servs.*, 30 F.3d 183, 185 (D.C.Cir.1994)). However, "Exemption 7(C) is 'broader and more easily satisfied' than Exemption 6 'so that disclosure . . . is more difficult to obtain.'" *Forsythe v. United States Nat'l Lab. Rels. Bd.*, 14 CV 3127 (NGG) (LB), 2016 WL 1165897, at *4 (E.D.N.Y. Feb. 16, 2016) (citation omitted). This distinction is grounded in the text of the statute: "whereas Exemption 6 requires that the invasion of privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C) . . . . [And] whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion." *United States Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989).

The Seidel Declaration details the information sub-categories that Defendant withheld in reliance of Exemptions 6 and 7(C). One category includes the names and identifying information of FBI special agents ("SAs") and professional staff. (DE 22 ¶ 72.) The Seidel Declaration notes:

Assignments of SAs to any particular type of investigation are not be choice. Publicity, adverse or otherwise, arising from a particular investigation and/or use of specific FBI investigative techniques, may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work . . . . Persons targeted by [SA] investigations/ investigative activities or those sympathetic to those targeted, could seek to inflict violence on an SA based on his or her participation in an investigation. An individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years, and may seek revenge on SAs and other federal employees involved in a particular investigation.

(*Id.* ¶ 73.) The Declaration offers similar reasoning for FBI professional staff, who "were, and possibly are, in positions of access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations" (*id.* ¶ 74), as well as non-FBI government personnel, (*id.* ¶ 76).

The Declaration next explains that names and identifying information of third parties "merely mentioned" in investigative records were withheld under Exemptions 6 and 7(C). (*Id.* ¶ 75.) Although these individuals were not of investigative interest

14

to the FBI, Defendants contend that these individuals "maintain substantial and legitimate privacy interests in not having [their] information disclosed" because such disclosure "would subject [them] to possible harassment or criticism and focus derogatory inferences and suspicion on them. Furthermore, considering the responsive records at issue concern medical treatment and procedures, the individuals merely mentioned are likely patients," making the information highly personal and sensitive.

Also withheld were records including names and identifying information of third parties who provided information to Defendant during the investigation of Plaintiff. (*Id.* ¶ 77.) Defendant withheld this information because "[s]uch exposure, in conjunction with [the third parties'] cooperation with law enforcement, could lead to harassment, intimidation by investigative subjects, legal or economic detriment, possible physical harm, or even death." (*Id.* ¶ 78.) Moreover, because, again, the investigation of Plaintiff involved medical treatments and procedures, the fact that interviewees provided information related to their medical histories or treatment results in the withheld treatment being highly personal and possible embarrassing for the third parties. (*Id.*)

Finally, Defendant protected the names and identifying information of third parties who were or are of investigative interest to the FBI. (*Id.* ¶ 79.) Defendant asserts that such individuals maintain substantial privacy interests in not having their identities disclosed because "[b]eing identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, regardless of whether these individuals committed criminal acts." (*Id.*) Such negative stigma "could result in

professional and social repercussions" for the individuals. (*Id.*)

The Court finds that, in each of the above instances, disclosure of the withheld documents "would constitute a clearly unwarranted invasion of personal privacy," weighing in favor of a finding that Defendant appropriately withheld the documents under Exemption 7(C). *Cook*, 758 F.3d at 174. The documents withheld under these exemptions were made for the purposes of law enforcement, as they all relate to the federal criminal investigation of Plaintiff. *See Robbins Geller Rudman & Dowd LLP v. United States Sec. & Exch. Comm'n*, 419 F. Supp. 3d 523, 531 (E.D.N.Y. 2019) ("An agency's statement that records were compiled as a part of an investigation suffices to establish that records were compiled for law enforcement purposes without further factual findings."). Further, "[c]ase law has identified a number of potential adverse results," including the results articulated in the Seidel Declaration, "related to the disclosure of the identities of individuals who appear in documents compiled for law enforcement purposes." *Garcia*, 181 F. Supp. 2d at 371; *see, e.g.*, *id.* at 373 (noting that identifying information of witnesses and investigative agents warrants protection under Exemption 7(C) because the possibility of, among other things, threats of reprisal, harassment, and stigma of being associated with a criminal investigation) (citations omitted); *Halpern*, 181 F.3d at 296–97 (holding that the FBI was justified in its withholding of documents under Exemption 7(C) that included identities of FBI agents, cooperating witnesses and third parties— including cooperating law enforcement officials—and third parties who were of investigative interest to the FBI). As such, Defendant has established strong privacy interests in support of their withholding of documents under Exemption 7(C).

Plaintiff, on the other hand, has not come forward with any public interest that would weigh in favor of the disclosure of this information. Rather, Plaintiff concedes that he "understands that some of the names involved could be blocked out[,] such as the agents, professional staff who ha[ve] not been previously identified or third parties mentioned who have not [been] previously identified." (DE 25 at 23.) Plaintiff only contends—which the Court construes as an attenuated public interest argument—that he is entitled to documents containing private, third party information because he knew the names of patients and people working in his office who ultimately became witnesses in his criminal case. (*Id.* at 11.) Plaintiff, however, fails to cite to any authority supporting this contention. The government is not foreclosed from asserting FOIA exemptions even if the withheld information was previously known, or even disclosed, to the requestor in the past. *Cf. Mingo v. United States Dep't of Just.*, No. 08–2197 (CKK), 2009 WL 2618129, at *2 (D.D.C. Aug. 24, 2009) (holding that "*Brady* does not foreclose the government from asserting FOIA exemptions even as to information that may have been previously disclosed to a defendant in a criminal proceeding") (citation omitted). Nor does the public domain doctrine provide relief for Plaintiff.[5]

Accordingly, the privacy interests asserted by Defendant are not outweighed by any public interest claimed by Plaintiff, and withholding under Exemption 7(C) is appropriate.[6] Because Exemption 7(C) applies here and is broader than Exemption 6, there is no need to analyze the withheld documents under Exemption 6. *Reps. Comm. for Freedom of Press*, 489 U.S. at 762 n.12. As such, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant for documents withheld under Exemption 6 and 7(C).

### *FOIA Exemption 7(A)*

Exemption 7(A) permits the withholding of records or information "compiled for law enforcement purposes" if

---

[5] Under the "public domain doctrine," FOIA exemptions "do not apply 'if identical information is otherwise in the public domain.'" *Robbins Geller Rudman &Dowd LLP*, 419 F. Supp. 3d at 536 (quoting *Inner City Press/Cmty. On the Move v. Bd. Of Governors of Fed. Reserve Sys.*, 463 F.3d 239, 244 (2d Cir. 2006)). "The party asserting the public availability of the information bears the burden of production because '"[i]t is far more efficient, and obviously fairer" . . . [and] [t]o hold otherwise would require the opponent of disclosure to prove a negative.'" *Id.* (citation omitted). The requester, to satisfy his burden, must point "to specific information in the public domain that appears to duplicate that being withheld." *Id.* (citation omitted). Plaintiff here fails to satisfy his burden to the extent that he relies on the public domain doctrine. Despite arguing that he is entitled to information that he had access to in his medical practice and that was subsequently used against him at trial, Plaintiff has failed to point to specific information that is publicly available, and instead makes blanket, conclusory assertions regarding his perceived entitlement to these documents and information. Accordingly, although not explicitly relied upon by Plaintiff, the Court has considered the public domain doctrine and found that it does not necessitate disclosure given Plaintiff's inability to point to specific, publicly available information duplicative of what Defendant has withheld.

[6] Defendant also withheld numerous documents at the direction of the United States Postal Inspection Service ("USPIS"). (DE 22 ¶ 108.) The Declaration of Kietta T. Lockerman—Information Disclosure Technician at the USPIS—largely sets forth the same justifications for withholding under Exemption 7(C) as above, namely that law enforcement agents' names and telephone numbers, and third-party names, addresses, and statements required protection due to the possibility of "unwanted contacts, threats, stigmatization and harassment for being connected with a criminal investigation" for the third-parties, and "harassment and annoyance" for the agents. (DE 22-17 ¶¶ 1, 9–10.) Thus, these documents were also properly withheld by Defendant pursuant to Exemption 7(C).

production of such materials "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). "The purpose of this exemption is to prevent harm to the government's case in court by not allowing litigants earlier or grater access to agency investigatory files than they would otherwise not have." *N.Y. Times Co. v. United States Dep't of Just.*, 390 F. Supp. 3d 499, 512 (S.D.N.Y. 2019) (internal quotation marks and citation omitted). To justify withholding, the defendant agency must show that "(1) a law enforcement proceeding is pending or prospective[;] and (2) release of the information could reasonably be expected to cause some articulable harm." *Id.* at 513 (internal quotation marks and citation omitted). Defendant agencies "need not justify the withholding of each document with specific facts, but rather allow the court to be able to trace a rational link between the nature of the document and the alleged likely interference." *Robbins Geller Rudman & Dowd LLP*, 419 F. Supp. 3d at 530 (internal quotation marks and citation omitted).

Defendant here properly withheld four documents pursuant to Exemption 7(A). These documents were compiled for law enforcement purposes because they pertain to pending FBI investigations. (DE 22 ¶ 81; *see Robbins Geller Rudman & Dowd LLP*, 419 F. Supp. 3d at 531.) Defendant asserts that disclosure of this information "would reveal information concerning pending enforcement procedures, including the existence of undisclosed investigations and proceedings," which in turn "would provide criminals with information about the government's investigation and enforcement strategies in ongoing matters, allow them to predict and potentially thwart these strategies, and allow them to discover or tamper with witnesses or destroy evidence." (DE 22 ¶ 81.) Disclosure of the withheld documents would thus

undoubtedly interfere with Defendant's investigations and enforcement proceedings. Defendant has therefore satisfied its burden of justifying withholding under Exemption 7(A). *See Clevenger*, 2020 WL 1846565 at *13 (holding that FOIA withholding under Exemption 7(A) was justified where release of requested information "could potentially [have] allow[ed] investigated individuals to evade law enforcement and would [have] allow[ed] criminals to assess the FBI's strengths and weaknesses as well as their resources").

Accordingly, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant for documents withheld under Exemption 7(A).

### FOIA Exemption 7(E)

Exemption 7(E) exempts from disclosure records or information compiled for law enforcement purposes if such information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The Second Circuit

> has interpreted this exemption to cover two categories of information, one in which disclosure would disclose "techniques and procedures," or "how law enforcement officials go about investigating a crime," and the other in which disclosure would disclose "guidelines" for law enforcement investigations or how the

agency allocates resources in planning future policy or conduct.

*Gonzalez v. United States Citizenship & Immigr. Servs.*, 475 F. Supp. 3d 334, 351 (S.D.N.Y. 2020) (quoting *Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) ("*Lowenstein*"). Records containing information about law enforcement techniques and procedures are "categorically exempt from FOIA disclosure, 'without need for demonstration of harm.'" *Iraq Refugee Assistance Project v. Dep't of Homeland Sec.*, No. 12-cv-3461, 2017 WL 1155898, at *5 (S.D.N.Y. Mar. 27, 2017) (quoting *Lowenstein*, 626 F.3d at 681)); *accord Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011) (""Exemption 7(E) sets a relatively low bar for the agency to justify withholding" and "only requires that the agency demonstrate logically how the release of the requested information might create a risk of circumvention of the law.") (internal quotation marks, brackets, and citation omitted).

The Seidel Declaration sets forth several categories of information that Defendant withheld—and the reasons for the withholding—pursuant to Exemption 7(E). Defendant first withheld reports and data stemming from the FBI's analysis of digital media collected during the investigation of Plaintiff, which was conducted by the Computer Analysis Response Team ("CART"). (DE 22 ¶ 92.) CART acquires, preserves, examines, and presents digital information stored on electronics recovered during FBI investigations. (*Id.*) The Seidel Declaration states that disclosure of such information would "impede the FBI's effectiveness in investigating crimes" involving digital data because it would "aid in circumvention of the law by providing

criminals the information necessary to adjust behavior in order to avoid detection, develop and/or use technology less susceptible to law enforcement detection or scrutiny, and develop and/or use technology to counteract techniques used by CART." (*Id.*) These statements logically explain how public disclosure of the withheld CART information would aid criminals in circumventing the law. Indeed, the withholding of non-public information about CART software, equipment, techniques, procedures, and reports generated during the forensic examination of devices—the same information withheld here—has been upheld under Exemption 7(E). *See, e.g.*, *Accurso v. Fed. Bureau of Investigation*, No. 19-2540 (CKK), 2021 WL 411152, at *8 (D.D.C. Feb. 5, 2021). Thus, the reports and data stemming from CART operations were properly withheld under Exemption 7(E).

Defendant next withheld FBI database information and search results. (DE 22 ¶ 93.) The Seidel Declaration lists numerous reasons why such information, if made public, would impede the FBI's investigative effectiveness and allow criminals to circumvent investigative techniques. These include: revealing FBI strategies in response to different investigative circumstances; providing criminals with an understanding of the scope of FBI collected intelligence on particular subjects; revealing the types of information stored by the FBI and, therefore, the information most helpful to the FBI; and, finally, allowing criminals who may gain access to an FBI system know exactly where to look for certain information. (*Id.* ¶¶ 94–96.) The disclosure of such database query information would indeed expose the FBI's law enforcement techniques and procedures, and thus aid criminals in circumventing FBI investigations. *See Iraqi Refugee Assistance Project*, 2017 WL 1155898, at *11 (holding

that Exemption 7(E) covers "queries of law enforcement database[s]"); *accord Strunk v. United States Dep't of State*, 905 F. Supp. 2d 142, 148–49 (D.D.C. 2012) (holding that computer transaction and function codes warranted protection under Exemption 7(E)) (citing cases). As such, Defendant appropriately withheld this information under Exemption 7(E).

Defendant also protected from disclosure tactical information contained in operational plans. According to the Seidel Declaration, "[t]hese plans often include strategies for surveillance, placement of personnel, communications during the operations, contingency/abort plans, administrative and equipment information, deadly force authorization information, [and] targets' background information," among other things. (DE 22 ¶ 98.) The public release of this information would thus allow "others targeted in similar operations [to] predict the FBI's strategies and bolster their operational security," and "could potentially risk the lives of FBI agents and other law enforcement personnel executing these plans." (*Id.*) Such operational plans, if made public, would allow other investigatory subjects "to become familiar with the FBI's surveillance methods and develop countermeasures to circumvent surveillance operations." *Gatson v. Fed. Bureau of Investigation*, No. 15-5068, 2017 WL 3783696, at *13 (D.N.J. Aug. 31, 2017). Thus, Defendant appropriately relied on Exemption 7(E) in withholding this information.

Information contained in effectiveness ratings within FBI FD-515 forms was also withheld. On the FD-515 forms—which are used "to report statistically important events, such as an arrest, conviction, sentencing, asset seizure, or disruption/dismantle of a criminal enterprise"—Defendant redacted rating columns located adjacent to publicly-known investigative techniques, ranking them based on effectiveness. (DE 22 ¶ 99.) The Seidel Declaration explains that, should the ratings column be released, individuals involved in similar criminal activities could "change their methods and modus operandi to circumvent law enforcement and avoid detection and disruption by the FBI." (*Id.*) Defendant also redacted portions of the FD-515 forms that included "Assisting Agencies" information because, as asserted by the Seidel Declaration, disclosing which agencies have assisted the FBI in investigating subjects would, in effect, disclose those agencies' interests in the subjects, thereby allowing them "to predict law enforcement actions, modify their behavior in a manner which avoids the investigative efforts of law enforcement, and enable them to circumvent the law. (*Id.* ¶ 100.) Finally, Defendant withheld FD-515 "Subject Description Codes," which signifies the nature of gathered intelligence on subjects, as well as the FBI's level of investigative focus on the subject. (*Id.* ¶ 101.) The Seidel Declaration contends that the release of this information into the public sphere "would permit criminals to determine whether the FBI has detected particular criminal activities, allowing them to preemptively destroy incriminating evidence, and embolden them to continue undetected criminal activities." (*Id.*) Defendant has demonstrated that the FBI FD-515 form information—including the rating columns, the "Assisting Agencies" information, and the "Subject Description Codes"—would impede the FBI's investigative effectiveness and allow criminals to circumvent its law enforcement techniques if made public. Moreover, courts have found that this kind of information is properly withheld under Exemption 7(E). *See Petrucelli v. Dep't of Just.*, 106 F. Supp. 3d 129, 139 (D.D.C. 2015) (holding that FBI

properly withheld ratings column of Form FD-515); *Gonzalez*, 475 F. Supp. 3d at 351–52 (holding that event codes are covered by Exemption 7(E)); *Bishop v. United States Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 389 (S.D.N.Y. 2014) (same) (citing cases). Accordingly, this information was properly withheld under Exemption 7(E).

Further, Defendant withheld materials that reveal internal email addresses and non-public intranet web addresses. (DE 22 ¶ 102.) The Seidel Declaration states that "[r]eleasing this information would provide criminals with specific targets for possible cyber-attacks and attacks on FBI secure communications," noting that, in our current cyber-security climate, such information would allow hackers to exploit and manipulate FBI information technology systems. (*Id.*) Given the sophistication of hackers, and the tools that internal email addresses and non-public intranet web addresses would arm them with, Defendant has supplied a sufficient basis to support withholding this information under Exemption 7(E). *See Freedom of Press Found. v. Dep't of Just.*, 493 F. Supp. 3d 251, 274 (S.D.N.Y. 2020) (holding that internal secure e-mail and intranet web addresses were properly withheld under Exemption 7(E)).

Defendant additionally withheld monetary amounts requested by FBI personnel and paid by the FBI in implementing its investigative techniques under the investigation of Plaintiff. (DE 22 ¶ 103.) This information, as set forth in the Seidel Declaration, "could reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts, which could, in turn, reveal how the FBI plans to allocate its limited resources and essentially paint a picture as the where the FBI's strengths and weaknesses lie" if disclosed to the public. (*Id.*) While a closer call than other withheld information under Exemption 7(E), Defendant has met the low bar of showing that disclosure of such payment information would create *the risk* of circumvention of law. As such, the monetary payment information was properly withheld under Exemption 7(E). *See Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (information reflecting monetary payments for investigative techniques were properly withheld under Exemption 7(E)).

Finally, Defendant withheld the name, location, and contact information of a third-party provider that the FBI utilized to provide evidence storage in the investigation of Plaintiff. (DE ¶ 22104.) Public disclosure of this information, according to the Seidel Declaration, "would enable criminals to target the location of such stored evidence and materials, which could compromise the information or result in its destruction." (*Id.*) Again, Defendant has met its burden in demonstrating that the release of this information publicly would create a risk of criminals circumventing the law, namely by targeting the storage location of evidentiary materials stored by third-parties at the behest of the FBI. Thus, this information was properly withheld pursuant to Exemption 7(E).

In sum, the undersigned respectfully recommends that summary judgment be granted in favor of Defendant as to the withholdings based on Exemption 7(E).

### FOIA Exemption 7(D)

Exemption 7(D) exempts from disclosure records or information compiled for law enforcement purposes when disclosure:

could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information complied by a criminal law enforcement agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D). A source is confidential if it "furnished information with the understanding that the FBI would not divulge the communication except to the extent the Bureau thought necessary for law enforcement purposes." *United States Dep't of Just. v. Landano*, 508 U.S. 165, 174 (1993). Thus, "[a] source is confidential if he or she 'provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.'" *Garcia*, 181 F. Supp. 2d at 375 (quoting *Landano*, 508 U.S. at 172).

Unlike the other withheld information, Defendant has not satisfied its burden in describing the non-disclosure of confidential source information in sufficient detail. The Seidel Declaration provides a thorough explanation of why the withholding of confidential source information is generally important for the FBI. What it does not do, however, is provide *any* discernable description of the confidential source information Defendant withheld in this particular case. It does not state the number of sources employed, whether these sources were given express or inferred assurances of

confidentiality, or whether these sources even provided information used in the investigation of Plaintiff. Such information—if included—would be specific enough to satisfy Defendant's burden, while concomitantly vague enough to maintain FOIA's purpose of protecting the substance of the material. Defendant's *Vaughn* index is equally deficient—the vague document descriptions for materials withheld under Exemption 7(D) include "FD-302" (DE 22-14 at 9); "Proffer agreement" (*Id.* at 18); and "interview notes" (*Id.* at 30–32, 34–37, 39, 45); and "FD-340a – index list of 1A items" (*Id.* at 38). This scarce detail provides little to no insight on the substance of these documents, and therefore inadequately explains whether they were properly withheld as confidential source material. For these reasons, the Court finds that Defendant has not met its burden for documents withheld under Exemption 7(E). That said, all of the documents withheld pursuant to Exemption 7(E) were also withheld under other Exemptions 6 and 7(C) which, as discussed above, Defendant established as sufficient bases for withholding. *See supra* at 13–16; *see also Amnesty Int'l USA v. C.I.A.*, 728 F. Supp. 2d 479, 515 (S.D.N.Y. 2010) ("Regardless of the Court's finding, however, most, if not all, of the documents withheld under Exemption 2 were also withheld under Exemptions 1 or 3. Therefore, although Exemption 2 is an insufficient basis to withhold the documents, the records are still covered by Exemptions 1 and 3.") Thus, although the undersigned recommends that summary judgment be denied insofar as Defendant's withholding based on Exemption 7(E), that recommendation has no practical effect on the ultimate recommendation to grant summary judgment with respect to the documents also withheld under Exemptions 6 and 7(C).

**Court Order**

"It is beyond question that a court may issue orders prohibiting disclosure of documents or information." *F.D.I.C. v. Ernst & Ernst*, 677 F.2d 230, 232 (2d Cir. 1982) (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). A federal court's authority to seal documents generally takes precedence over FOIA that would otherwise require disclosure of those documents. *City of Hartford v. Chase*, 942 F.2d 130, 135 (2d Cir. 1991) (citation omitted). However, "[w]hether a sealing order removes information from FOIA's purview . . . depends on the reason the order was issued." *Long v. United States Dep't of Just.*, 5:06-CV-1086 (NMA/TWD), 2012 WL 13028918, at *4 (N.D.N.Y. Mar. 31, 2012) (citing *Morgan v. United States Dep't of Just.*, 923 F.2d 195, 197 (D.C. Cir. 1991); *Concepcion v. Fed. Bureau of Investigation*, 699 F. Supp. 2d 106, 111 (D.D.C. 2010)). It appears that the Second Circuit has yet to provide any guidance on this specific issue. The District of Columbia Circuit has explained, however, that

> the mere existence of a court seal is, without more, insufficient to justify nondisclosure under the FOIA. Instead, only those sealing orders intended to operate as the functional equivalent of an injunction prohibiting disclosure can justify an agency's decision to withhold records that do not fall within one of the specific FOIA exemptions.

*Morgan*, 923 F.2d at 199; *accord Hohner v. United States Dep't of Just.*, 812 F. App'x 408, 409 (9th Cir. 2020) ("The government bears the burden of showing that a sealing

order prohibits disclosure of relevant agency records requested under FOIA.") (memorandum). The *Morgan* court held that, to satisfy its burden of showing that the court entered the sealing order with the intent of prohibiting FOIA disclosures of affected documents, agencies may

> refer[] to, *inter alia*: (1) the sealing order itself; (2) extrinsic evidence, such as transcripts and papers filed with the sealing court, casting light on the factors that motivated the court to impose the seal; (3) sealing orders of the same court in similar cases that explain the purpose of the imposition of the seals; or (4) the court's general rules or procedures governing the imposition of seals.

*Id.* (footnote omitted); *see Hohner*, F. App'x at 409 (holding that agency satisfied burden that court order prohibited FOIA disclosure by submitting the sealing order and subsequent order which clarified that the order was intended to prohibit disclosure of the documents at issue).

Defendant here withheld 53 pages of responsive records in full pursuant to a sealing order issued in a separate case. (DE 22 ¶ 105.) Beyond this, Defendant has provided no additional information regarding the court order—it has not provided the order itself, any extrinsic evidence, or sealing orders in the Eastern District of New York that would serve to explain the purpose of the seal. The Court cannot ascertain from Defendant's perfunctory statement whether sealing order prohibits FOIA disclosure of the withheld documents. Accordingly, the undersigned recommends that Defendant be given fourteen (14) days to provide

22

additional information elucidating if the sealing order indeed prohibits FOIA disclosures of the documents at issue. Should Defendant not provide additional information—or if the information provided is insufficient to justify withholding—the undersigned further recommends that summary judgment be denied as to the documents withheld pursuant to the court sealing order.

## Can the Documents be Segregated?

FOIA also provides that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). This provision mandates that agencies do not treat documents as "indivisible records" for FOIA purposes, but rather differentiate between the contents of each document, withholding only portions of the documents covered by an exemption and disclosing the rest. *Cox*, 504 F. Supp. 3d at 128 (quoting *F.B.I. v. Abramson*, 456 U.S. 615, 626 (1982)). Nonetheless, non-exempt information that is "inextricably intertwined" with exempt information need not be disclosed. *Hopkins v. United States Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 85 (2d Cir. 1991). "Information is 'inextricably intertwined' where 'disclosure would compromise the confidentiality of [exempt] information that is entitled to protection.'" *Cox*, 504 F. Supp. 3d at 128 (quoting *Hopkins*, 929 F.2d at 85). District courts must, on summary judgment, make specific findings on the ability to segregate the withheld documents. *See Color of Change*, 325 F. Supp. 3d at 455 (citation omitted). Despite having the burden of showing that information was properly segregated, agencies enjoy a presumption that they complied with FOIA's mandate to disclose reasonably segregable information. *Nat. Res. Def. Council v. United States Env't*

*Prot. Agency*, 17-CV-5928 (JMF), 2020 WL 6891537, at *4 (S.D.N.Y. Nov. 24, 2020) ("'Agencies are entitled to a presumption that [they] disclosed reasonably segregable material'") (quoting *Knight First Amend. Inst. at Columbia Univ. v. United States Dep't of Homeland Sec.*, 407 F. Supp. 3d 334, 343 (S.D.N.Y. 2019)).

Defendant has met its burden of showing that it properly segregated the information at issue here. As discussed above, a majority of the documents Defendant disclosed to Plaintiff were "released in part," or, said differently, segregated—out of the 2,159 responsive documents, Defendant released 718 in full, 973 in part, with the remaining 468 withheld in full. (DE 22 ¶ 4.) The Seidel Declaration makes clear that the 973 pages released in part "comprise[d] a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemption." (*Id.* ¶ 109.) For the documents ultimately withheld in full, Defendant determined that either a FOIA exemption covered the entirety of the document, or that any "non-exempt information on these pages was so intertwined with exempt material that no information could reasonably segregated for release," as additional segregation of such material "would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content." (*Id.*) Based on these assertions, the Court concludes that Defendant has demonstrated that the withheld records do not contain reasonably segregable, non-exempt information. Moreover, Plaintiff has not come forward with any basis to overcome the presumption of good faith afforded to Defendant's Declaration. Accordingly, the undersigned respectfully recommends that

summary judgment on the issue of whether the withheld documents could be segregated be granted in favor of Defendant.

### *In Camera* **Review**

Based on the foregoing, Plaintiff's cross-motion for *in camera* review of every withheld document is without merit. As a general matter, "[i]n camera review is considered the exception, not the rule, and the propriety of such review is a matter entrusted in the district court's discretion." *Cox*, 504 F. Supp. 3d at 151 (internal quotation marks and citation omitted). When, as here, the agency declaration sufficiently establishes the bases of withholding and no evidence of agency bad faith exists, *in camera* review is typically not warranted. *See Local 3, I.B.E.W. AFL-CIO v. Nat'l Lab. Rel. Bd.*, 845 F.2d 1177, 1179–80 (2d Cir. 1988) (finding *in camera* review unnecessary because agency's detailed affidavit was sufficient to provide basis for court's ruling that documents were exempt from disclosure); *Garcia*, 181 F. Supp. 2d at 370–71 (declining to conduct *in camera* review where agency established that claimed exemptions were properly asserted and no evidence of bad faith existed). Accordingly, the undersigned recommends that Plaintiff's cross-motion for *in camera* review be denied.

### **CONCLUSION**

For the foregoing reasons, it is respectfully recommended that Plaintiff's cross-motion for *in camera* review be denied, Defendant's summary judgment motion be granted in part, and that Defendant be given fourteen (14) days to provide additional information regarding the applicable of the court sealing order to the present FOIA withholdings. The undersigned further recommends that, should Defendant not provide additional information—or if the

information provided is insufficient to justify withholding—summary judgment be denied as to the documents withheld pursuant to the court sealing order.

### **OBJECTIONS**

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir.2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:  Central Islip, New York
            August 4, 2021

/s/ *James M. Wicks*
James M. Wicks, U.S.M.J.